**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **CITY OF EAST ST. LOUIS,** individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | Case No.:   3:21-cv-561 |
| **NETFLIX, INC., DISNEY STREAMING SERVICES, LLC, APPLE INC., HULU, LLC, HOME BOX OFFICE, INC., AMAZON.COM SERVICES, LLC, CBS ENTERTAINMENT, LLC, YOUTUBE, INC., CURIOSITYSTREAM, INC, PEACOCK TV, LLC, DIRECTV CORPORATION,** and **DISH NETWORK SERVICE, LLC** | *Jury Trial Demanded* |
| . | |
| Defendants. | |

## PETITION FOR DECLARATORY JUDGMENT AND OTHER RELIEF
## CLASS ACTION COMPLAINT

Plaintiff **City of East St. Louis** ("Plaintiff" or "East St. Louis"), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), brings this action for declaratory judgment and other relief against Defendants **Netflix, Inc., Disney Streaming Services, LLC, Apple Inc., Hulu, LLC, Home Box Office, Inc., Amazon.com Services, LLC, CBS Entertainment, LLC, YouTube, Inc., CuriosityStream, Inc., Peacock TV, LLC, DirecTV Corporation, and Dish Network Service, LLC** (collectively "Defendants") and for its Petition, states as follows:

1

## I.    <u>INTRODUCTION</u>

1.     Since 2007, the **Cable and Video Competition Law of 2007** (the "Act"), 220 ILCS 5/21-100 *et seq.*, has required providers of video service in Illinois to affirmatively apply for and receive a video service authorization from the Illinois Commerce Commission and pay video service provider fees to Illinois cities, villages, incorporated towns, and counties.

2.     Defendants have and continue to provide video service in Illinois cities, villages, incorporated towns, and counties.  When doing so, Defendants transmit their programming through wireline facilities located at least in part on public rights-of-way within Illinois cities, villages, incorporated towns, and counties.

3.     However, rather than comply with the Act, Defendants evade their statutory responsibilities and sidestep their obligations to pay video service provider fees to Illinois cities, villages, incorporated towns, and counties.

4.     Accordingly, Defendants should be and are required by the Act to pay each of those Illinois cities, villages, incorporated towns, and counties a video service provider fee of up to 5% percent of their gross revenue, as derived from their providing video service in each unit.

5.     Defendants have failed to pay the required fee, thereby necessitating this Action, and entitling Plaintiff and the putative class to the relief requested herein.

## II.    <u>PARTIES</u>

4.     Plaintiff, the **City of East St. Louis, Illinois**, is municipally chartered as a Home Rule Unit of local government pursuant to §6 of Article VII of the Illinois Constitution and is duly authorized to bring this action. As a chartered Home Rule, East St. Louis exercises thereunder all powers of local self-government.

5.     Defendant Netflix, Inc. ("**Netflix**") is a Delaware corporation, headquartered in Los Gatos, California.  Netflix's primary business is its video service, which offers online streaming of a library of films and television programs, as well as the distribution and production of original films and television series.  Netflix does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

6.     Defendant Disney Streaming Services, LLC ("**Disney Streaming Services**") is a Delaware corporation, headquartered in New York, New York. Disney Streaming Services' primary business is its video service, Disney+, which offers online streaming of a library of films and television programs, as well as the distribution and production of original films and television series. Disney Streaming Services does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

7.     Defendant, Apple Inc. ("**Apple**") a Delaware corporation, headquartered in Cupertino, California. Apple's primary business is its video service, Apple TV+, which offers online streaming of a library of films and television series.

Apple does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

8.      Defendant Hulu, LLC ("**Hulu**") is a Delaware limited liability company, headquartered in Santa Monica, California.  Hulu's primary business is its video service, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series.  Hulu does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

9.      Defendant, Home Box Office, Inc. ("**HBO**") is a New York corporation, headquartered in New York City, New York. HBO's primary business is its video service, HBO Max, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. HBO does business in East St. Louis, Illinois, and has done so at all times relevant to this action.[1] [2]

10.     Defendant, Amazon.com Services, LLC ("**Prime**") is Delaware corporation, headquartered in Wilmington, Delaware.  Prime's primary business is its video service, Amazon Prime, which offers online streaming of live video programming and a library

---

[1] HBO Max, which closed the third quarter at 8.6 million activated subscribers in the U.S., has added another four million to reach 12.6 million as of early December, according to AT&T CEO John Stankey. Dade Hayes, *HBO Max Has Reached 12.6 Million Activations, AT&T CEO John Stankey Reports, With Engagement Up 36% In Past Month*, DEADLINE (Dec. 8, 2020), https://deadline.com/2020/12/hbo-max-streaming-12-6-million-subscribers-att-ceo-john-stankey-the-undoing-1234652083.
[2] As of September 30, the service had a nominal total of 28.7 million paying subscribers, including HBO pay television customers whose subscriptions make them eligible for free access to HBO Max, but who have not yet activated.

of films and television programs, as well as the distribution and production of original films and television series. Prime does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

11.     Defendant, CBS Entertainment, LLC ("**CBS Entertainment**") is a New York corporation headquartered in New York City, New York. CBS Entertainment's primary business is its video service, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. CBS Entertainment does business in East St. Louis, Illinois, and has done so at all times relevant to this action.[3]

12.     Defendant, **YouTube, Inc.** (YouTube) is a Delaware corporation, headquartered in San Bruno, California. YouTube's primary business is its video service, YouTube Premium, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. YouTube does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

13.     Defendant, CuriosityStream, Inc. ("**CuriosityStream**") is a Delaware corporation headquartered in Silver Spring, Maryland. CuriosityStream's primary

---

[3] Megan Graham, *CBS All Access streaming service is getting a new name: Paramount+*, CNBC (Sept. 15, 2020), https://www.cnbc.com/2020/09/15/cbs-all-access-rebranded-as-paramount-plus-.html.

business is its video service, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. CuriosityStream does business in East St. Louis, Illinois, and has done so at all times relevant to this action.[4] [5]

14.     Defendant, PeacockTV, LLC ("**Peacock**") is a Delaware corporation headquartered in New York, New York. Peacock's primary business is its video service, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. Peacock does business in East St. Louis, Illinois, and has done so at all times relevant to this action.[6]

15.     Defendant, DirecTV Corporation ("DirecTV") is a Delaware corporation headquartered in El Segundo, California. DirecTV's primary business is its video service, which offers online streaming of live video programming and a library of films and television programs. DirecTV does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

16.     Defendant, DISH Network Service, LLC ("Dish") is a Colorado corporation headquartered in Englewood, Colorado. Dish's primary business is its

---

[4] Benjamin Mullin, *Discovery Channel Founder Pivots After Hitting Ceiling for Cord-Cutter Bonanza*, WSJ (Aug. 2, 2018), https://www.wsj.com/articles/discovery-channel-founder-pivots-after-hitting-ceiling-for-cord-cutter-bonanza-1533214801.
[5] Lucas Shaw, *Streaming Services Quietly Gathers More Subscribers Than HBO Now*, BLOOMBERG (Dec. 10, 2019), https://www.bloomberg.com/news/articles/2019-12-10/streaming-service-taps-stephen-hawking-to-outdraw-espn-hbo.
[6] Chaim Gartenberg, *Peacock Hits Nearly 22 Million Users, But It's Not Clear How Many Are Paying*, THE VERGE (Oct. 29, 2020), https://www.theverge.com/2020/10/29/21539909/peacock-22-million-users-comcast-q3-2020-earnings.

video service, which offers online streaming of live video programming and a library of films and television programs. Dish does business in East St. Louis, Illinois, and has done so at all times relevant to this action.

### III.   JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action in accordance with 28 U.S.C. §1332(a) and (d).  Defendants are citizens of different states from that of the Plaintiff, the putative class size is greater than 100, and the aggregate amount in controversy for the proposed Class exceeds $5,000,000.00, exclusive of interest and costs.

18.    Venue is proper in this District, and this Court has personal jurisdiction over Defendants, pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants "transact affairs" in this District; each Defendant continuously and systematically engaged in and continues to engage in business in this District.

### IV.   FACTUAL ALLEGATIONS

#### A.  *Statutory Authority to Bring this Action: 220 ILCS 5/21-100 et seq.*

19.    In order to offer video service in Illinois, an entity is required under the Act to obtain a "State-issued authorization." 220 ILCS 5/21-401.

20.    The Act defines "video service" as "**video programming** and subscriber interaction, if any, that is required for the selection or use of such video programming

7

services, and **that is provided through wireline facilities located at least in part in the public rights-of-way without regard to delivery technology, including Internet protocol techn**ology…" 220 ILCS 5/21-201(v) (emphasis added).[7]

21.     The Act further defines "video programming" by incorporating the definition set out in 47 U.S.C. § 522(20): "the term 'video programming' means programming provided by, or generally considered comparable to programming provided by, a television broadcast station." *See* 220 ILCS 5/21-201(u).[8]

22.     In other words, under the Act, an entity is required to first seek authorization before providing programming comparable to that provided by a television broadcast station using wireline facilities located, at least in part, on the public rights of way.

23.     Defendants provide video service to their subscribers to view television shows, movies, and documentaries, and compete with other cable or video providers, offering video programming.[9]

---

[7] The definition of "video service" continues as follows: "This definition does not include any video programming provided by a commercial mobile service provider defined in subsection (d) of 47 U.S.C. 332 or any video programming provided solely as part of, and via, service that enables users to access content, information, electronic mail, or other services offered over the public Internet."

[8] In 1992, the Federal Communication Commission ("FCC") interpreted that the definition of "video service" refers to what constituted broadcast television programming in 1984. 7 FCCR cd. 5781 at ¶74 (1992). While such programming is usually linear and multichannel, the FCC has determined that "video-on-demand images can be severed from the interactive functionalities and thereby constitute video programming." 10 FCC Rcd. 244 at ¶¶103–111(1994).

[9] Pursuant to 220 ILCS 5/21-201(u), "video programming" has the same meaning as in 47 U.S.C. 522, the "Cable Communications Policy Act of 1984," Pub. L. No. 98-549, 98 Stat. 2781.

24.     Defendants' video programming is comparable to that provided by television-broadcast stations and cable companies[10] including, but not limited to, such areas as format, genre, and content.

25.     Defendants transmit video programming directly to subscribers located within the geographic boundaries of the State of Illinois.

**B.   The Local ISP-Gateway to the Internet**

26.     Each of the Defendants charge subscribers a fee to access their video programming, like traditional cable companies and others offering video service in Illinois who have obtained authorization and paid video service provider fees. Defendants, thus, earn gross revenues from transmitting video programming to subscribers through facilities located at least in part in a public right-of-way.

27.     Defendants store their video content either within or directly connected to the network facilities of local internet service providers, and then there deliver the content to subscribers directly through a local Internet Service Provider ("ISP") to subscriber connections through wireline facilities located in the public right of way.

28.     An ISP typically serves as the access point or the gateway that provides a user, access to everything available on the Internet. The ISP is an organization that provides a myriad of services for accessing, using, or participating in the Internet. Internet service providers can be organized in various forms, such as commercial,

---

[10] Pursuant to 47 U.S.C.A § 522(20), "video programming" means programming provided by, or generally considered comparable to programming provided by, a television broadcast station.

community-owned, non-profit, or otherwise privately owned. Internet services typically provided by ISPs can include Internet access, Internet transit, domain name registration, web hosting, Usenet service, and colocation.[11]

29.   At first, ISPs generally offered dial-up connections, using the public telephone network to provide last-mile connections to their customers. Later, ISPs were accessed using cable television lines using broadband technology such as cable modems and digital subscriber line (DSL). These lines and cables lie within public rights of ways in the United States and in the State of Illinois.

30.   Customers view Defendants' video programming—such as television shows, movies, and documentaries—using an internet-connected device. Internet-connected devices are electronic devices that have software enabling them to stream Defendants' video programming, including smart televisions, streaming media players like Roku or Apple TV, tablets, smartphones, video game consoles, set-top boxes from cable and satellite providers, Blu-ray players, and personal computers.

31.   Customers view the Defendants' video programming by streaming it over the internet, but none of the Defendants actually provide video programming solely as part of and via service that enables users to access services over the public internet.  This is because the video programming offered was not over the public Internet, as such services are offered only to paying subscribers.

---

[11] *What is an Internet Service Provider?* WHAT IS MY IP ADDRESS (2021), https://whatismyipaddress.com/isp.

32.     When a subscriber wants to watch the Defendants' video programming, he or she uses an internet-connected device to send a request to their local ISP. The ISP then forwards that request to Defendants' dedicated internet servers, which, in turn, provide a response.  This response is then relayed back to the subscriber's device, and Defendants deliver the video programming via internet protocol technology (i.e., broadband wireline facilities located at least in part in public rights-of-way).

### C. Netflix, Open Connect and Cloud Computing

33.     Defendant Netflix, Inc. is an American video streaming provider. When a Netflix subscriber wants to view programming, the subscriber's internet service provider will connect the subscriber to the closest Netflix "Open Connect" server to offer the fastest speeds and best video quality. Netflix has placed Open Connect servers in nearly 1,000 separate locations in the United States.[12]

34.     Open Connect is the name of the global network that is responsible for delivering Netflix TV shows and movies to its members world-wide.[13] Open Connect is an open-source software application for connecting to virtual private networks (VPN), which implement secure point-to-point connections, or "Content Delivery Network" [14] ("CDN") because its job is to deliver internet-based content (via

---

[12] Michelle Clancy, *Netflix Moves All Global Traffic to Open Connect CDN*, RAPID TV NEWS (Mar. 19, 2016), https://www.rapidtvnews.com/2016031942170/netflix-moves-all-global-traffic-to-open-connect-cdn.html#axzz6m1ipHAmz.
[13] Netflix, *Open Connect Overview*, NETFLIX, INC. (2019), https://openconnect.netflix.com/Open-Connect-Overview.pdf.
[14] A content delivery network, or content distribution network (CDN), is a geographically distributed network of proxy servers and their data centers. The goal is to provide high availability and performance by distributing the service spatially relative to end users. CDNs came into existence in the late 1990s as a means for alleviating the performance bottlenecks of the Internet. Erik Nygren, et al., *The Akamai Network: A Platform for High-Performance Internet Applications*, AKAMAI TECHNOLOGIES 1, 2–19

HTTP/HTTPS) efficiently by bringing the content that people watch close to where the subscriber is watching it.

35.     CDNs now serve a large portion of the Internet content, including web objects (text, graphics and scripts), downloadable objects (media files, software, documents), applications (e-commerce, portals), live streaming media, on-demand streaming media, and social media sites.[15]

**Content Delivery Network**



36.     In 2011, Netflix began its Open Connect initiative, as a response to the ever-increasing scale of Netflix streaming, it stated, for two reasons:

a)      As Netflix grew to be a significant portion of overall traffic on consumer Internet Service Provider (ISP) networks, it became important to be able to work with those ISPs in a direct and collaborative way; and

b)      Creating a content delivery solution customized for Netflix to design a proactive, directed caching solution that is much more efficient than the

(Sept. 13, 2012), https://www.akamai.com/us/en/multimedia/documents/technical-publication/the-akamai-network-a-platform-for-high-performance-internet-applications-technical-publication.pdf.
[15] Evi Nemeth, et al., *Chapter 19, Web hosting, Content Delivery Networks, in* UNIX AND LINUX SYSTEM ADMINISTRATION HANDBOOK 690, 690 (5th ed. 2018).

standard demand-driven CDN solution, reducing the overall demand on upstream network capacity by several orders of magnitude.[16]

37.     In order to accomplish these tasks, Netflix created Open Connect Appliances ("OCA"s) which store Netflix's video content. OCAs are purpose-built server appliances which store encoded video/image files and serve these files via HTTP/HTTPS to client devices (for example: set top boxes, mobile devices, or smart TVs). OCAs have the sole responsibility of delivering playable bits to client devices as fast as possible. [17]

38.     In order to traverse the public internet, large companies and cloud service providers run datacenters, colloquially referred to as "the cloud." [18] A datacenter is a large building or group of buildings that house hundreds of inter-connected computer systems, telecommunications, and other data storage systems. Once that data is uploaded either remotely or through a live time transmission, that data is sent to the closest datacenter to the original upload. The reason is simple, the closer the data center, the faster the data reaches it.

---

[16]Netflix, *Open Connect Overview*, NETFLIX, INC. (2019), https://openconnect.netflix.com/Open-Connect-Overview.pdf.
[17] *Id.*
[18] Cloud computing is the on-demand availability of computer system resources, especially data storage (cloud storage) and computing power, without direct active management by the user. Large clouds, predominant today, often have functions distributed over multiple locations from central servers. If the connection to the user is relatively close, it may be designated an edge server. Ahmadreza Montazerolghaem, et al., *Green Cloud Multimedia Networking: NFV/SDN Based Energy-Efficient Resource Allocation*, IEEE 873, 873–889 (Mar. 23, 2020), https://ieeexplore.ieee.org/document/9044834.

39.     The top three cloud computing companies in the United States, as of October 2020, are Amazon Web Service (AWS), Microsoft's Azure and Google Cloud, with AWS at nearly 32% of worldwide cloud infrastructure services.[19]

40.     Netflix utilizes AWS for its cloud computing and explains this process on its website:



20

41.     Netflix provides the OCAs to qualifying internet service providers and the OCAs are then deployed directly inside the IPA networks. The internet service provider partner uses the OCA to provide video content to its Netflix subscribers. Close to 90% of Netflix's global traffic is delivered via these direction connections

between OCAs and the internet service providers Netflix customers use to access the internet.[21]

42.     According to Netflix, that means that most of its subscribers receive Netflix's video programming from servers either inside of, or directly connected to, the subscriber's internet service provider's network within their local region. Netflix has "end-to-end" control of its entire Open Connect system, including any servers located in East St. Louis and/or other Illinois municipalities and/or counties.

**D.  Other Defendants also use ISP and Cloud Computing to Stream Video Content**

43.     Similar to Netflix, when streaming subscribers want to view the other Defendants' video programming, the subscriber's Internet service provider will connect the subscriber to the server.

44.     These Defendants receive the directive and check the subscriber's entitlement, the location, and the content availability. It then delivers the program to the subscriber's internet-connected device via the internet. These Defendants place video content onto servers either inside of or directly connected to an internet service provider, and from there, the internet service provider directly delivers the content to a customer.

**E.  Use of Public Rights of Ways**

---

[21] Ken Florance, *How Netflix Works With ISPs Around the Globe to Deliver a Great Viewing Experience*, NETFLIX (Mar. 17, 2016), https://about.netflix.com/en/news/how-netflix-works-with-isps-around-the-globe-to-deliver-a-great-viewing-experience.

45.     Defendants' subscribers typically use a broadband internet connection, such as DSL or fiber optic cable to receive Defendants' programming.  In East St. Louis, common providers of broadband internet include Spectrum, EarthLink, AT&T, MediaCom, Wisper, Frontier and others.

46.     Broadband internet connections rely upon wireline facilities located in whole or in part in the public right(s)-of-way to deliver internet service to subscribers. That means that Defendants operate and provide their video service to Defendants' subscribers through wireline facilities located, at least in part, in the public right-of-way, because they use these broadband internet connections in the public right-of-way to stream their programming.

47.     There are no requirements in the Act for Defendants to construct, own, or operate these wireline facilities. The wireline facilities can be owned and operated by a third party.  Thus, it is of no consequence that Defendants do not place wires and cables under streets, because Defendants' subscribers use broadband internet connection, which employs DSL or fiber optic cable, to receive Defendants' programming.

48.     In fact, the Act states that video service can both be provided and is provided through wireline facilities located at least in part in the public rights-of-way without regard to delivery technology, including Internet protocol technology.[22]

49.     As made manifest in the Act, the Illinois legislature intended the Act to video service providers such as the Defendants, not simply cable companies.[23]

### F.  *Defendants Skirt Illinois Commerce Commission Video Service Authorization*

50.     As video service providers using wireline facilities and the rights-of-ways, Defendants were required to apply for and receive a state-issued video service authorization obtained from the Illinois Commerce Commission.[24]   Additionally, Defendants were required to provide ten days' advance written notice to Plaintiff and other Illinois municipalities before it started providing its video service in those jurisdictions.[25]

---

[22] Pursuant to 220 ILCS 5/21-201(v), "Video service" means "video programming and subscriber interaction, if any, that is required for the selection or use of such video programming services, and that is provided through wireline facilities located at least in part in the public rights-of-way without regard to delivery technology, including Internet protocol technology."

[23] Pursuant to 220 ILCS 5/21-201, the legislative findings regarding video service are, *inter alia*, "investment in new communications, cable services, and video services infrastructure, including broadband facilities, fiber optic, and Internet protocol technologies," and "increasing consumer access to robust and reliable broadband products" and "enable rapid and widespread entry by competitive providers, which will bring to Illinois consumers the benefits of video competition, including providing consumers with more choice, lower prices, higher speed and more advanced Internet access, more diverse and varied news, public information, education, and entertainment programming, and will bring to this State and its local units of government the benefits of new infrastructure investment, job growth, and innovation in broadband and Internet protocol technologies and deployment."

[24] Pursuant to 220 ILCS 5/21-401(a)(1), "A person or entity seeking to provide cable service or video service pursuant to this Article shall not use the public rights-of-way for the installation or construction of facilities for the provision of cable service or video service or offer cable service or video service until it has obtained a State-issued authorization to offer or provide cable or video service under this Section…."

[25] Pursuant to 220 ILCS 5/21-801(a), "Prior to offering cable service or video service in a local unit of government's jurisdiction, a holder shall notify the local unit of government. The notice shall be given to the local unit of government at least 10 days before the holder begins to offer cable service or video service within the boundaries of that local unit of government."

51.     Defendants failed to apply for, and receive, a state issued video service authorization pursuant to the Act. Indeed, the Illinois Commerce Commission lists the persons or entities which have received a valid state issued certificate, and none of the Defendants appear on the Illinois Commerce Commission list with approved authorizations. [26] Additionally, Defendants failed to provide ten days' advance, written notice to Plaintiff and other Illinois municipalities and counties, and, therefore, have been and continue to provide video service throughout Illinois without legal authorization, and in contravention of the Act.

52.     Had Defendants provided the statutorily required ten days' advance, written notice, then Plaintiff and other Illinois municipalities and counties would have been provided an opportunity, as set forth in the Act, to notify Defendants of the percentage of gross revenues required to be paid for providing video service in those jurisdictions (i.e., the video service provider fee).[27]

53.     The Act authorizes video service providers, such as Defendants, to use public rights-of-way, as long as said video service providers make a quarterly video service provider payment to each municipality and county in which it provides video

---

[26] As of February 10, 2021.
[27] Pursuant to 220 ILCS 5/21-801(b), "[i]n any local unit of government in which a holder offers cable service or video service on a commercial basis, the holder shall be liable for and pay the service provider fee to the local unit of government."

service.[28] The required video service provider payment is 5% of gross revenues[29] received by the franchise holder from the provision of video services in that unit of local government.

54.     Defendants were required to obtain a state-issued certificate of authority pursuant to the Act before providing their video service in East St. Louis and the other Illinois municipalities and counties, just as others who provide video servicers have. Defendants' failure to obtain a certificate of authority, however, did not relieve Defendants of the obligation to pay a video service provider fee of 5% of their gross revenues derived from providing such video service in those counties and municipalities.  Nothing in the Act provides that an entity otherwise providing video services is exempt from this requirement, or from liability in this Court.  Furthermore, nothing in the Act is intended to be inconsistent with federal law.

55.     Moreover, the Act does not limit free speech or discriminate, but instead regulates the medium used in a neutral manner.  Finally, the Act is technologically neutral; it does not specifically target electronic companies, only video service providers who use the public rights of way.

---

[28] Pursuant to 220 ILCS 5/21-801(b), "[t]he payment of the service provider fee shall be due on a quarterly basis, 45 days after the close of the calendar quarter."
[29] Pursuant to 220 ILCS 5/21-801(b), "[t]he fee authorized by this Section shall be 5% of gross revenues or the same as the fee paid to the local unit of government by any incumbent cable operator providing cable service."

56.     By failing to obtain the required authorization for providing video service in the City of East St. Louis and in other Illinois municipalities and counties, and provide ten days' advance, written notice before providing video service in East St. Louis and the other Illinois municipalities and counties in which they provide their video services, Defendants have intentionally evaded their obligation to pay the video service provider fee.

57.     Defendants failed to comply with the Act because they failed to receive authorization and provide ten days' advance, written notice, directly resulting in the failure to pay Plaintiff and the other Class members the required video service provider fee of up to 5% of gross revenues.

58.     Plaintiff, individually and on behalf of other Illinois municipalities and counties, seeks to require Defendants to abide by the Act and pay the fees they owe to these municipalities and counties.

## V.     CLASS ACTION ALLEGATIONS

59.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff bring this action on behalf of itself and a proposed Class initially defined as: "All Illinois cities, villages, incorporated towns, and counties in which one or more of the Defendants has provided video service (the 'Class')."[30]

---

[30] Pursuant to 220 ILCS 5/22-501, "Local unit of government" means a city, village, incorporated town, or a county.

60.     Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members.

61.     Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

62.     This action has been brought and may properly be maintained on behalf of the Class.

63.     **Numerosity:** The proposed Class is sufficiently numerous that individual joinder of all Class members is impracticable.  Indeed, the Class size is believed to be in excess of 1,298 municipalities and 102 counties.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

64.     **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

a   Whether Defendants provide video service, as defined by 220 ILCS 5/21-201(b) of the Act, within Plaintiff's and the other Class members' geographic areas;

b   Whether Defendants are video service providers, as defined by 220 ILCS 5/21-201(h);

    c   Whether Defendants were required to file an application with the Illinois Commerce Commission for a state issued certificate of pursuant to 220 ILCS 5/21-401;

    d   Whether Defendants have failed to pay franchise fees pursuant to 220 ILCS 5/21-801;

    e   The appropriate measure of damages to award Plaintiff and the other Class members; and

    f   The appropriate declaratory relief to which Plaintiff and the other Class members are entitled.

65.   **Typicality:** Plaintiff's claims are typical of the other Class members' claims because Plaintiff and each of the other Class members is entitled to video service provider fee payments from Defendants pursuant to 220 ILCS 5/21-801 and Defendants have failed to pay Plaintiff and each of the other Class members those video service provider fees.  Plaintiff is asserting the same claims and legal theories individually.

66.   **Adequacy of Representation:** Plaintiff is an adequate Class representative because its interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where defendants breached statutory obligations, and Plaintiff intends to prosecute this action vigorously.  Class members' interests will be fairly and adequately protected by Plaintiff and its counsel.

67. **Declaratory and Injunctive Relief:** Defendants acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below, with respect to the Class members.

68. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CLAIMS ALLEGED

### COUNT I
### Action for Declaratory and Injunctive Relief
### Cable and Video Competition Law of 2007

69. Plaintiff repeats, realleges, and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

70. Defendants provide "video services", and are "video service providers", in East St. Louis and each city, village, incorporated town, and county comprising the Class pursuant to 220 ILCS 5/21-201(v) and (h) of the Act.

23

71.     Defendants derive gross revenue, as defined in 220 ILCS 5/21-801(c), from providing video services in East St. Louis and each city, village, incorporated town, and county comprising the Class.

72.     Defendants have failed to comply with 220 ILCS 5/21-801 of the Act as they have failed to pay Plaintiff and the other Class members the required video service provider fees.

73.     Pursuant to 220 ILCS 5/21-801, 220 ILCS 5/21-901, 220 ILCS 5/21-1301(a) and 65 ILCS 5/11-42-11.05, Plaintiff has the right to enforce applicable rights and obligations, including and audit and collection of any deficiency.

74.     Pursuant to 220 ILCS 5/21-901, Plaintiff and other Class members are entitled to conduct an audit of Defendants' records pertaining to their gross revenue.

75.     Plaintiff and the other Class members are, therefore, entitled to damages as a result of Defendants' violations of 220 ILCS 5/21-201 and 220 ILCS 5/21-801, along with pre-and post-judgment interest, in an amount to be determined at trial.

76.     In equity, Plaintiff further requests this court that at the Defendants' expense, they pay an independent auditor for the purpose of verifying the accuracy of a video service provider's calculation of the video service provider fees, to be paid to the municipal corporation or county in the time frame authorized by this Court.

### COUNT II
### *Violation of 220 ILCS 5/21-801*

77.     Plaintiff repeats, realleges, and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

78.     Defendants provide video service, and are video service providers, in East St. Louis and every city, village and county comprising the Class. 220 ILCS 5/21-201.

79.     Defendants derive gross revenues from providing these video services.

80.     Defendants are thus required, by statute, to pay each Class member in which they provide video service, a video service provider fee of up to 5% of their gross revenues derived from their operations in that municipality. 220 ILCS 5/21-801.

81.     Failure to receive the required authorization from the Illinois Commerce Commission does not relieve Defendants' obligation to comply.

82.     Defendants have failed to comply with 220 ILCS 5/21-801 because they have failed to pay Plaintiff and the other Class members up to 5% of gross revenues, as required.

83.     Plaintiff and the other Class members are, therefore, entitled to damages as a result of Defendants' violations of 220 ILCS 5/21-801, along with pre- and post-judgment interest, in an amount to be determined at trial.

## VII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

a.   Enter an Order certifying the above-defined Class and designating Plaintiff as Class Representative, and Plaintiff's counsel as Class Counsel;

b.   Award all monetary relief to which Plaintiff and the other Class members are entitled, including as set forth above;

c.   Award an audit, pursuant to 220 ILCS 5/21-901, of Defendants' records pertaining to their gross revenue.

d.   Award pre- and post-judgment interest;

e.   Award reasonable attorneys' fees and costs to Plaintiff's counsel; and

f.   Grant such further and other relief as this Court deems appropriate.

Plaintiff demands a jury trial on some or all issues triable of right by a jury.

Dated:  June 9, 2021

CITY OF EAST ST. LOUIS, individually and on behalf of all others similarly situated, PLAINTIFF,

/s/ CJ Baricevic
CJ Baricevic, IL Bar No. 6305418
CHATHAM & BARICEVIC, CITY ATTORNEY
107 W. Main, Suite 1
Belleville, IL 62220
PHONE:  (618) 233-2200
cj@chathamlaw.org

/s/ John J. Driscoll
John J. Driscoll, IL Bar No. 6276464
THE DRISCOLL FIRM, LLC
1311 Ave. Ponce de Leon
6th Floor
San Juan, PR. 00907
(314) 932-3232
john@thedriscollfirm.com

/s/ Roy L. Mason
Roy L. Mason
Zach E. Howerton
SMOUSE & MASON, LLC
223 Duke of Gloucester Street
Annapolis, MD 21401
(410) 269-6620
rlm@smouseandmason.com
zeh@smouseandmason.com

/s/ Marc D. Grossman
Marc D. Grossman (*pro hac vice pending*)
Melissa K. Sims, IL Bar No. 6231297
Greg Coleman (*pro hac vice pending*)
Daniel K. Bryson (*pro hac vice pending*)
Patrick M. Wallace (*pro hac vice pending*)
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN,    PLLC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
(800) 530-9800
mgrossman@milberg.com
msims@milberg.com
gcoleman@milberg.com
dbryson@milberg.com
pwallace@milberg.com